| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK | **NOT FOR PUBLICATION** |
|---|---|
| ROBERT CHESTNUT, | |
| Petitioner, | |
| – against – | **MEMORANDUM & ORDER** |
| JAMIE LAMANNA, Superintendent | 19-cv-00133 (ERK) |
| Respondent. | |

KORMAN, *J.*:

## BACKGROUND

On October 13, 2011, in the middle of the afternoon, Robert Chestnut approached Troy Watt and his friend Hector Ramos at the intersection of Howard and MacDougal Streets in Brooklyn, New York. Realizing that Chestnut was carrying a large gun, Watt tried to run away, but Chestnut shot Watt five times below the waist. Chestnut then stood over Watt and asked if he "want[ed] to die." At this point, Ramos released his two dogs to attack Chestnut, who then fled into an apartment building down the block. Chestnut first stopped at Bernard Winn's apartment, where he stowed his MAC-11 gun in Winn's oven. Chestnut then went downstairs in the same building to Richard Void's apartment, where he hid in a closet under a pile of laundry. Approximately ten to fifteen minutes after the assault, Watt told a detective that "Shark Head" had shot him with a MAC-11. Chestnut, who was arrested soon thereafter, has a tattoo of a shark fin with the word "Shark" on his arm, and referred to himself as "Shark" on recorded phone calls. While receiving treatment at King's County Hospital, Watt provided a videotaped statement that subsequently served as his grand jury testimony.

After a jury trial in Supreme Court, Kings County, Chestnut was convicted of assault in the first degree and two counts of criminal possession of a weapon in the second degree on October 15, 2013, and sentenced to a term of 18 and a half years. Chestnut now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, to order his release or afford him a new trial. Chestnut cites two grounds for relief: (1) a Confrontation Clause claim on the basis that Watt's grand jury testimony was improperly admitted, and (2) ineffective assistance of trial counsel. As outlined below, Chestnut's ineffective assistance of trial counsel claim largely mirrors the ineffective assistance of appellate counsel claim he raised in his writ of error *coram nobis*.

## PROCEDURAL HISTORY

A. Sirois *Hearing*

On September 20, 2013, before Chestnut's trial, the court conducted a *Sirois* hearing to determine the admissibility of Watt's grand jury testimony at trial, given Watt's absence from New York and unavailability to testify in person. The People presented evidence that Chestnut coordinated actions to prevent Watt and other key witnesses from testifying against him at trial. Specifically, over the course of 11 phone calls made from Rikers Island, Chestnut conspired with his brother to work with their associates "Boo" and "Ra" to ensure that Watt and other grand jury witnesses were too scared to cooperate with the People. Sept. 20 Hr'g at 4:22–7:14. According to the Assistant District Attorney, Chestnut stated he "need[ed] to know who testified against him so they c[ould] be on the situation," and that "the D.A. can't pull a rabbit out of a hat without a cooperating witness." *Id*. at 5:24–25, 6:5–6.

On top of these phone calls, the People also presented evidence that Chestnut conspired to pay for the victim's silence. King's County Detective Jerome Dancy testified that when he reached out to Watt and his family, Watt's mother told him that she "was approached by somebody who

identified themselves as the defendant's aunt and offered $3,000 to not testify," and that "[a]fter that there were numerous threats on the streets and that ha[d] caused Troy to leave the jurisdiction." *Id*. at 6:14–18, 51:17–52:1 (Dancy).

Finally, King's County Detective Charles Bellavia testified that one of Chestnut's associates confronted Bernard Winn on Chestnut's behalf. Bellavia testified that when he interviewed Winn, Winn told him he was "approached by an unknown male across the street from his residence," who "stated to him in sum and substance that [he knew] that [Winn] told the cops everything about the gun in the oven," and that "[he] better go down there and change [his] statements." *Id.* at 43:14–21. In light of this evidence, the court held that Chestnut had waived any objection to the admissibility of Watt's grand jury testimony. Sept. 24 Hr'g at 5:24–6:4.

B. *Relevant Events at Trial*

The People began their case at trial by playing the video of Watt's grand jury testimony (taken when Watt was in King's County Hospital after the shooting). Watt's testimony outlined the facts of his assault: "Shark Head" (Chestnut) approached Watt and Ramos in broad daylight, shot Watt multiple times, and asked Watt if he "want[ed] to die," before Ramos' dogs forced Chestnut to flee the scene. Detective Grandstaff then testified that when he arrived at the scene of the shooting approximately ten minutes after the incident, Watt, who "was afraid he was going to die," told him that "Shark Head" shot him repeatedly with a MAC-11. Trial Tr. at 93:20–24, 94:2–6 (Grandstaff). Detective Grandstaff also testified that he recovered a small handgun from a lockbox in Void's apartment. *Id*. at 99:19–100:2 (Grandstaff).

Winn testified a few days later. Winn stated that he saw Chestnut coming from the scene of the shooting to his apartment carrying a gun. Winn further testified that Chestnut came to his apartment immediately after the shooting, and put the MAC-11 gun in his oven before proceeding downstairs to Richard Void's apartment, *id*. at 220:2–21 (Winn), where he was ultimately

3

discovered hiding under a pile of laundry. Winn testified that he moved the MAC-11 from his oven to the basement, and subsequently retrieved the gun from the basement and provided it to detectives. *Id*. at 227:15–23 (Winn).

Samantha Orans, a forensic analyst from the Office of the Chief Medical Examiner ("OCME"), testified that DNA taken from the trigger, safety, and slide release of the MAC-11 matched DNA collected from Chestnut and his clothing. *Id*. at 360:15–24, 369:3–12 (Orans). No evidence suggested that the small handgun retrieved from Void's apartment was used to shoot Watt, and it was never tested for Chestnut's DNA.

### C. *Direct Appeal and Writ of Error* Coram Nobis

Chestnut raised four arguments on direct appeal: (1) that the introduction of video of Watt's grand jury testimony violated Chestnut's Confrontation Clause rights; (2) that the court should have given a missing witness charge as to an alleged eyewitness; (3) that the evidence was insufficient to establish that Watt sustained serious physical injury as a result of the shooting; and (4) that he had ineffective assistance of trial counsel, on the basis that his attorney failed to object to the testimonial evidence regarding DNA found on Chestnut and the MAC-11 gun.

On appeal, the Appellate Division rejected each of these claims. With respect to Chestnut's Confrontation Clause claim, it held that "the Supreme Court properly determined that the People established, by clear and convincing evidence, that the complainant had been rendered unavailable due to threats made at the defendant's initiative or acquiescence," so it was proper "to use [Watt's] grand jury testimony as part of their direct case at trial." *People v. Chestnut*, 149 A.D.3d 772, 773 (N.Y. App. Div. 2017). As to Chestnut's ineffective assistance of trial counsel claim, the Appellate Division held that "defense counsel's failure to object to the admission of certain DNA evidence did not constitute ineffective assistance of counsel." *Id*. at 774. On June 8, 2017, the New York Court of Appeals denied Chestnut's leave to appeal. *People v. Chestnut*, 29 N.Y.3d 1077 (2017).

4

On April 6, 2018, Chestnut moved *pro se* for a writ of error *coram nobis*, arguing that his appellate counsel was inadequate on the grounds that she failed to argue that: (1) the evidence of the re-testing of the MAC-11 violated Chestnut's Confrontation Clause rights; (2) the expert's testimony about the MAC-11 and ammunition was inadmissible hearsay and violated Chestnut's Confrontation Clause rights; (3) the failure to test a second gun found in Richard Void's apartment violated Chestnut's Confrontation Clause rights and prevented Chestnut from raising a complete defense; (4) prospective jurors were not properly sworn in; and (5) the People's criminalist testimony regarding DNA test results violated Chestnut's Confrontation Clause rights. On September 26, 2018, the Appellate Division denied Chestnut's application, holding that he "failed to establish that he was denied the effective assistance of appellate counsel." *People v. Chestnut*, 164 A.D.3d 1467 (N.Y. App. Div. 2018), *leave to appeal denied*, 32 N.Y.3d 1170 (2019).

## DISCUSSION

*A. Standard of Review*

The Antiterrorism and Effective Death Penalty Act allows a federal court to grant habeas relief to a prisoner convicted under state law when the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "[C]learly established Federal law, as determined by the Supreme Court of the United States" must involve the "holding[], as opposed to the dicta," of a Supreme Court decision, *Williams v. Taylor*, 529 U.S. 362, 365 (2000), that gives a "clear answer to the question presented," *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (*per curiam*). In determining what constitutes an "unreasonable application of [] clearly established Federal law," a federal habeas court should ask whether the state court's application of clearly established federal law was "objectively unreasonable."

5

*Williams,* 529 U.S. at 409. A state prisoner must therefore demonstrate that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). This is a "highly deferential standard," requiring that state courts "be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). However, "[i]t preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." *Harrington*, 562 U.S. at 102.

The scope of review is thus extremely narrow, and findings of the trial court cannot be reversed or set aside without a showing that "the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Field v. Lord*, No. 05-CV-0564 (ENV), 2013 WL 5524708, at *14 (E.D.N.Y. Oct. 4, 2013), *aff'd*, 600 F. App'x 30 (2d Cir. 2015).

    B.  *Confrontation Clause Claim*

Chestnut's first habeas claim is that the introduction of Watt's recorded grand jury testimony at trial violated his Confrontation Clause rights. Pet. at 6. While a defendant is typically guaranteed an opportunity to cross-examine and confront his accuser, a defendant forfeits that right if he causes an accuser's unavailability through chicanery, threats, or actual violence. *United States v. Dhinsa*, 243 F.3d 635, 651 (2d Cir. 2001); *United States v. Mastrangelo*, 693 F.2d 269, 272 (2d Cir. 1982). As stated above, the trial court concluded that Chestnut caused Watt's unavailability through various schemes of intimidation and bribery Chestnut personally directed. Sept. 24 Hr'g at 5:21–6:8.

I review the trial court's determination regarding Chestnut's forfeiture by wrongdoing as a question of fact guarded by a presumption of correctness. *See Field*, 2013 WL 5524708, at *14; *Grayton v. Ercole*, No. 07-CV-0485 (SLT), 2009 WL 2876239, at *10 (E.D.N.Y. Sept. 8, 2009),

*aff'd*, 691 F.3d 165 (2d Cir. 2012). Chestnut argues that the People did not produce sufficient evidence that he caused Watt's unavailability at trial. The record plainly indicates otherwise. During its pre-trial *Sirois* hearing, the trial court heard 11 phone calls in which Chestnut sought to intimidate Watt (and other witnesses) from testifying. Sept. 24 Hr'g at 4:8–6:4. The court also heard testimony from Detectives Bellavia and Dancy corroborating those calls, further supporting the conclusion that Chestnut procured Watt's silence through bribery and intimidation. *Id*. Chestnut has not rebutted any of this evidence, and his petition offers no reason for why I should doubt the court's analysis.

Chestnut has also failed to show that the Appellate Division's decision was contrary to, or an unreasonable application of, clearly established federal law. Forfeiture by wrongdoing is a firmly established doctrine, and courts in this Circuit have had ample opportunity to consider the circumstances under which it applies. *See, e.g.*, *Perkins v. Herbert*, 596 F.3d 161, 166–67, 172–73 (2d Cir. 2010). While New York law requires clear and convincing evidence that the accused's misconduct caused the unavailability of the witness in question, *People v. Cotto*, 92 N.Y.2d 68, 75–76 (1998), on habeas review, the Second Circuit only imposes a preponderance-of-the-evidence burden, *see United States v. Mastrangelo*, 693 F.2d 269, 273 (2d Cir. 1982) ("We see no reason to impose upon the government more than the usual burden of proof by a preponderance of the evidence where waiver by misconduct is concerned."); *see also Perkins*, 596 F.3d at 173 n.9. Under this standard, the Appellate Division's conclusion that Chestnut waived his confrontation rights as to Watt's grand jury testimony was not unreasonable. In conjunction with the 11 phone calls in which Chestnut personally conspired to track down and intimidate Watt, ample evidence suggested that Chestnut arranged for family and friends to cause Watt's unavailability through intimidation and bribery on his behalf. For these reasons, Chestnut's first claim is denied.

C. *Ineffective Assistance of Trial Counsel*

Chestnut's second habeas claim is that he received ineffective assistance of trial counsel. Specifically, Chestnut argues that his trial counsel was ineffective because he failed to: (1) object to the court's failure to swear in the panel of prospective jurors, (2) object to the improper discharge of jurors, (3) object to "false testimony" regarding the reliability of ballistic evidence, and (4) argue there was insufficient evidence showing that the MAC-11 was the weapon used against Watt or that it was operable at the time of the shooting.

1. <u>Exhaustion</u>

Federal habeas corpus relief is only available after a petitioner exhausts available state court remedies, and gives the state courts a fair opportunity to review the merits of the claim. 28 U.S.C. § 2254(b)(1); *Daye v. Attorney Gen. of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982). Chestnut concedes that he did not raise the four instant ineffective assistance of counsel arguments on direct appeal. Pet. at 8. Nonetheless, Chestnut asserts that he raised the instant claims in his *pro se* writ of error *coram nobis*. *Id*. The government disputes that Chestnut raised his ineffective assistance of trial counsel claims in state court, arguing that Chestnut's writ of error *coram nobis* only raised ineffective assistance of *appellate* counsel claims. Opp. at 10–11.

Even assuming Chestnut is relying on the same facts and law he cited in his writ of error *coram nobis* to argue his current ineffective assistance of trial counsel claim, those parallel claims do not satisfy the exhaustion requirement. Under New York law, *coram nobis* applications can only address errors of appellate counsel. *People v. Gordon*, 183 A.D.2d 915, 915 (1992). Therefore, as federal courts have held, "even if a claim of ineffective assistance of trial counsel is raised in a *coram nobis* petition, it is insufficient to exhaust the claim." *Browne v. Heath*, No. 11-CV-1078 (DLI), 2014 WL 8390320, at *23 (E.D.N.Y. Aug. 25, 2014).

8

While Chestnut failed to raise his current ineffective assistance of trial counsel claim on direct appeal or through his writ of error *coram nobis*, it is also apparent that Chestnut has no remaining avenues to exhaust this claim in state court. Chestnut has already taken advantage of his direct appeal as of right to the Appellate Division, and sought leave from the New York Court of Appeals. As discussed above, Chestnut raised an ineffective assistance of trial counsel claim in his direct appeal, but that claim rested on different grounds than his current claim (as his petition concedes). Pet. at 8.

New York law bars review of a claim that could have been raised on direct review, including record-based claims. N.Y. Crim. Proc. Law § 440.10(2)(c) (McKinney 2019). Here, each basis for Chestnut's ineffective assistance of trial counsel claim is entirely reviewable on the trial record. Chestnut argues this his trial counsel failed to object during three episodes at trial—when the prospective jurors were impaneled, when two jurors were discharged, and when witnesses testified regarding ballistics evidence—all of which are memorialized on the record. By definition, Chestnut's remaining argument, that his counsel failed to argue that there was insufficient evidence that the MAC-11 was used against Watt or that it was operable at the time, depends entirely on the record. It would therefore be futile to require that Chestnut raise his novel ineffective assistance of trial counsel claim in state court. *See Sweet v. Bennett*, 353 F.3d 135, 140 (2d Cir. 2003); *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991); *Perkins v. Capra*, No. 14-CV-5260 (ENV), 2018 WL 6624206, at *6 (E.D.N.Y. Dec. 18, 2018) (holding that an ineffective assistance claim for failure to object depended solely on the trial record and could not be raised in a § 440.10 proceeding because it was not raised on direct appeal). Accordingly, I deem Chestnut's claim exhausted for purposes of habeas review, and turn to the matter of procedural default. *See Aparicio v. Artuz*, 269 F.3d 78, 91 (2d Cir. 2001).

## 2. Adequate and Independent State Ground—Procedural Default

As a general rule, federal courts cannot consider an issue of federal law on review of a state court judgment if that judgment also rests on an adequate and independent state ground. A federal court may not review habeas claims if the last state court to consider those claims relied on an independent and adequate state ground, such as a procedural bar, unless the petitioner can demonstrate cause and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 492 (1986); *Acosta v. Artuz*, 575 F.3d 177, 184 (2d Cir. 2009). Because Chestnut failed to raise his current record-based ineffective assistance of trial counsel claim in state court—and cannot do so now—his claim is procedurally defaulted. *See Aparicio*, 269 F.3d at 90.

The Second Circuit has consistently held that procedural default constitutes an adequate and independent state ground. *See Sweet v. Bennett*, 353 F.3d 135, 140 (2d Cir. 2003); *Davis v. Mantello*, 42 F. App'x 488, 490 (2d Cir. 2002) ("The unjustifiable failure to raise on direct appeal a claim that appears on the face of the record is a procedural default under New York law and therefore constitutes an independent and adequate state ground for the state courts rejection of the petitioner's claim."). Accordingly, Chestnut is not entitled to have his ineffective assistance of trial counsel claim reviewed unless he can show cause and actual prejudice. *DiGuglielmo v. Smith*, 366 F.3d 130, 135 (2d Cir. 2004); *Robinson v. Superintendent, Green Haven Corr. Facility*, No. 09-CV-1904 (KAM) (LB), 2012 WL 123263, at *5 (E.D.N.Y. Jan. 17, 2012).

Chestnut cannot show cause for procedurally defaulting on his ineffective assistance of trial counsel claim. In his petition, the only explanation Chestnut offers for his failure to raise his current ineffective trial counsel claim on direct appeal is that he suffered from ineffective assistance of appellate counsel, as argued in his *coram nobis* application. Pet. at 8. Chestnut's

explanation falls short. To the extent he raised the relevant ineffective appellate counsel claims below, the Appellate Division rejected them, and to the extent he failed to raise the relevant ineffective appellate claims, he has no excuse for his procedural default.

All else being equal, ineffective assistance of appellate counsel can establish cause sufficient to excuse a procedural default, but only when it is itself a valid constitutional claim. *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986); *Jelinek v. Costello*, 247 F. Supp. 2d 212, 263 (E.D.N.Y. 2003). Here, Chestnut's ineffective assistance of appellate counsel claim in state court corresponded to only some of the arguments he raises here—his lawyer's failure to object when the court allegedly failed to swear-in prospective jurors; his failure to object to "false testimony" regarding the reliability of ballistic evidence; and his failure to argue there was insufficient evidence showing that the MAC-11 gun was used against Watt or that it was operable at the time of the shooting. Pet. at 8. The Appellate Division necessarily adjudicated those arguments, when it held that Chestnut "failed to establish that he was denied the effective assistance of appellate counsel." *Chestnut*, 164 A.D.3d 1467, *leave to appeal denied*, 32 N.Y.3d 1170 (2019). Chestnut does not argue that the state courts unreasonably applied federal law in adjudicating his ineffective assistance of appellate counsel claim. Indeed, the Appellate Division's decision would surely be upheld under the highly deferential standard articulated in *Harrington*. Chestnut therefore has no cause for procedurally defaulting on the three ineffective assistance of trial counsel arguments nestled in his *coram nobis* application. *See Aparicio*, 269 F.3d at 93 ("The Appellate Division's conclusion on *coram nobis* that [petitioner] was not denied effective assistance of *appellate* counsel disposed of [petitioner's] only proffered cause for the failure to raise the trial counsel claim on direct appeal.").

The only claim that the Appellate Division did not necessarily address in its ruling on ineffective appellate counsel is that his trial counsel failed to object when the court discharged two

11

jurors. Passing over the fact that this argument is procedurally defaulted, *see Reyes v. Keane*, 118 F.3d 136, 140 (2d Cir. 1997), it is nevertheless without merit. Under New York law, a court may replace a juror who is made unavailable due to illness or other incapacity. N.Y. Crim. Proc. Law § 270.35 (McKinney 1999). Here, the court replaced one juror who revealed that given his 12-hour night shift, he was unable to fulfill his jury duties, and another juror who became unavailable due to multiple medical appointments. Trial Tr. 84:4–85:21, 278:8–279:11. Before each substitution, the court discussed the applicable law and confirmed with counsel that they consented to the changes. *Id*. Both substitutions were therefore proper.

Accordingly, Chestnut's ineffective assistance of trial counsel claim is procedurally barred and without merit. *See Friedgood v. Keane*, 51 F. Supp. 2d 327, 342 (E.D.N.Y. 1999).

## CONCLUSION

The petition for relief pursuant to 18 U.S.C. § 2254(d) is denied. I decline to issue a certificate of appealability.

**SO ORDERED.**

*Edward R. Korman*

Brooklyn, New York
October 21, 2019

Edward R. Korman
United States District Judge